# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TONY WADE FULLEN,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:16cv00003 |
| | ) | **REPORT AND** |
| **NANCY A. BERRYHILL,**[1] | ) | **RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Tony Wade Fullen, ("Fullen"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Oral argument has been requested by the plaintiff. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Based on the recommendation to remand, the undersigned has dispensed with oral argument.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Fullen protectively filed his application for DIB on February 22, 2011, alleging disability as of July 10, 2010, based on a back injury, chronic pain, neuropathy, anxiety and depression. (Record, ("R."), at 23, 269-70, 298, 332-33.) The claims were denied initially and upon reconsideration. (R. at 81-90, 92-102, 132-34, 137, 138-40.) Fullen then requested a hearing before an administrative law judge, ("ALJ"). (R. at 145.) In a decision dated January 11, 2013, an ALJ issued an unfavorable decision. (R. at 107-18.) Fullen pursued his administrative appeal, and the Appeals Council remanded his claim to the ALJ for further consideration. (R. at 125-26, 207.) On remand, a video hearing was held on July 29, 2014, at which Fullen was represented by counsel. (R. at 63-80.)

By decision dated September 26, 2014, the ALJ denied Fullen's claim. (R. at 23-36.) The ALJ found that Fullen met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 25.) The ALJ found that Fullen had not engaged in substantial gainful activity since

July 10, 2010, the alleged onset date.[2] (R. at 25.) The ALJ found that the medical evidence established that Fullen had severe impairments, namely degenerative disc disease of the lumbar spine, status-post spinal fusion with lower extremity radiculopathy, major depressive disorder, and generalized anxiety disorder, but he found that Fullen did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25-28.) The ALJ found that Fullen had the residual functional capacity to perform low-stress sedentary work[3] that involved only occasional decision making, changes in the work setting or interaction with the public or co-workers, that did not require lifting or carrying items weighing more than 20 pounds occasionally and 10 pounds frequently, standing and walking for more than two hours or sitting for more than six hours in an eight-hour workday, that allowed for a sit/stand option at 30-minute intervals, with only occasional climbing of ramps or stairs, balancing, stooping, kneeling and crouching, with no crawling or climbing of ladders, ropes or scaffolds and no concentrated exposure to vibration and hazards, such as moving machinery or unprotected heights. (R. at 28-34.) The ALJ found that Fullen was unable to perform his past relevant work. (R. at 34-35.) Based on Fullen's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Fullen could perform, including jobs as a final assembler, a printed circuit board assembly touch up

---

[2] Therefore, Fullen must show that he was disabled between July 10, 2010, the alleged onset date, and September 26, 2014, the date of the ALJ's decision, in order to be eligible for benefits.

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2016).

screener and an ampoule sealer. (R. at 35-36.) Thus, the ALJ concluded that Fullen was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 36.) *See* 20 C.F.R. § 404.1520(g) (2016).

After the ALJ issued his decision, Fullen pursued his administrative appeals, (R. at 207), but the Appeals Council denied his request for review. (R. at 1-5.) Fullen then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2016). This case is before this court on Fullen's motion for summary judgment filed August 10, 2016, and the Commissioner's motion for summary judgment filed September 13, 2016.

## II. Facts

Fullen was born in 1965, (R. at 68), which classified him as a "younger person" under 20 C.F.R. § 404.1563(c) at the time of the ALJ's decision. Fullen has a high school education has past work experience as assembling and inspecting tractor-trailer trailers and also as a supervisor and foreman. (R. at 69.) At his July 29, 2014, hearing, Fullen testified that there was not much he could do. (R. at 70.) Fullen said that he alternated between sitting and walking much of the day. (R. at 70.) He said that he could sit for up to one hour, and he could walk for up to 20 minutes. (R. at 70.) Fullen stated that, when his feet started to burn, he had to elevate them to get relief. (R. at 71.) He said that he would elevate his feet up to 15 times a day for between 5 and 20 minutes at a time. (R. at 71, 319.)

Mark Holloman, a vocational expert, also testified at Fullen's July 29, 2014, hearing. (R. at 74-78.) The ALJ asked Holloman to assume an individual less than

50 years old, with a high school education, with prior work experience similar to Fullen's, who could lift up to 20 pounds occasionally and 10 pounds frequently, stand or walk for about six hours and sit for up to six hours in an eight-hour workday. (R. at 76.) Holloman stated that such an individual could perform Fullen's past work as an inspector, a supervisor and a foreman. (R. at 76.) The ALJ then asked Holloman to assume the same individual, but who could stand and walk for two hours in an eight-hour workday and could never climb ladders, ropes or scaffolds or crawl, but could occasionally climb ramps or stairs or balance, stoop, kneel and crouch, and who would need to avoid concentrated exposure to vibration or to hazards with moving machinery or heights and who required a sit/stand option at 30-minute intervals. (R. at 77.) This individual also would require a low-stress job with only occasional decision making with a pretty stable work setting and only occasional interaction with the public or co-workers and would be absent from the job not more than once a month. (R. at 77.)

Holloman testified that such an individual could not perform any of Fullen's past relevant work, but other jobs were available in substantial numbers, such as work as a final assembler, a printed circuit board touchup screener and an ampoule sealer or pharmaceutical packager, that the individual could perform. (R. at 77-78.) Holloman stated that, if this individual needed to elevate his legs four to five times a day, there would be no jobs he could perform. (R. at 78.) Holloman stated there also would be no jobs if the individual could stand and walk less than two hours and sit less than six hours in an eight-hour workday and could never climb, balance, stoop, kneel, crouch or crawl. (R. at 78.)

In rendering his decision, the ALJ reviewed records from Wellmont Bristol Regional Medical Center; Johnson City Medical Center; Smyth County

Community Hospital; Carilion New River Valley Behavioral Health; Family Care of Chilhowie; East Tennessee Brain and Spine Center; Abingdon Psychological Services; Licensed Clinical Psychologist Robert C. Miller, Ed.D.; and Dr. Samina Yousuf, M.D. Fullen's counsel submitted additional records from Dr. Yousuf to the Appeals Council.[4]

Fullen was treated at Wellmont Bristol Regional Medical Center, ("BRMC"), on July 10, 2010, for injuries he said he suffered when he fell and hit his lower back on the concrete floor at work that day. (R. at 395-407.) Fullen complained of pain in his lower back radiating into his left leg, (R. at 396.) An x-ray of Fullen's left shoulder joint showed no fracture or dislocation with minimal degenerative changes in the acromioclavicular joint. (R. at 403.) An x-ray of Fullen's lumbar spine showed a mild to moderate compression deformity at the L2 vertebral body and mild degenerative changes mainly at the L5/S1 level. (R. at 404.) An x-ray of his cervical spine showed minimal spondylosis changes with no fracture. (R. at 406-07.) Fullen was diagnosed with a lumbosacral sprain/strain and left side sciatica, and he was discharged home. (R. at 396.) He was given prescriptions for Lortab and Flexeril. (R. at 396.) Fullen returned to BRMC on July 11, 2010, with continuing complaints of back pain. (R. at 386-93.) Fullen was diagnosed with left side sciatica and discharged home. (R. at 387.)

Fullen saw Rebecca Nash, a family nurse practitioner, on July 15, 2010, for follow-up from his fall at work. (R. at 481-82.) Fullen also stated that he thought

---

[4] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

he had suffered a heart attack recently. (R. at 481.) He said he was at work when he had chest pain/pressure, which extended into his left arm with no nausea or shortness of breath. (R. at 481.) Fullen said that he had suffered random, intermittent chest pain ever since that was not associated with exertion. (R. at 481.) An EKG was abnormal, and Nash ordered a stress test and blood tests. (R. at 481.) Regarding his back injury, Fullen said that the L2 compression fracture was an old injury and not received in the recent fall. (R. at 482.) Fullen stated that he was given Percocet, which helped his back pain. (R. at 482.) He said that he had pain in his left lumbar/sacral area, left buttock and left posterior leg to about the level of the knee. (R. at 482.) Nash stated that Fullen was minimally tender to palpation in the lumbar/sacral region on the left. (R. at 482.) Fullen's strength, reflexes and sensation were normal in his lower extremities. (R. at 482.) Nash prescribed Prednisone and Vicodin, and she ordered Fullen to remain off work for a week. (R. at 482.)

Fullen returned to see Nash on July 22, 2010, complaining of continuing lower back pain, radiating into his left leg to his heel. (R. at 480.) He also complained of occasional numbness and tingling in his toes. (R. at 480.) He did state that his pain had improved since his injury, but was still very significant. (R. at 480.) Nash noted that Fullen was minimally tender to palpation in the lumbosacral spine, with flexion limited to 45 degrees and limited extension with pain. (R. at 480.) Nash ordered a lumbar MRI, prescribed Percocet and ordered Fullen to remain off work. (R. at 480.)

Fullen underwent a cardiac stress test at Smyth County Community Hospital on July 16, 2010, the results of which were normal. (R. at 442.) X-rays of Fullen's lumbar spine, taken on July 30, 2010, showed narrowing of the L5-S1 disc space

and a stable compression fracture of the L2 vertebrae, with no other bony lesions and all other disc spaces maintained. (R. at 444.) An MRI taken of Fullen's lumbar spine the same day showed a mild compression deformity of the L2 vertebral body without evidence of marrow edema, which indicated it was an old fracture, slight posterior disc bulge at the L2 level with no significant spinal or foraminal stenosis seen, a mild disc space narrowing at the L4-5 level with no disc herniation, but a left-sided posterior disc bulge with a flattening of the anterior aspect of the thecal sac, and moderate narrowing of the disc space at the L5-S1 level with desiccated signal in the disc with small posterior disc herniation with some associated spurring. (R. at 445-46.) This disc herniation did contact the S1 nerve roots as they leave the thecal sac, but did not appear to displace them, causing a mild narrowing of the spinal canal. (R. at 445-46.) There were degenerative changes of the posterior facets, but no significant forminal stenosis. (R. at 445-46.)

Fullen returned to see Nash on August 5, 2010, stating that his back pain was "no better." (R. at 479.) He complained of "excruciating pain" in his lumbar region that went down into his left leg. (R. at 479.) Fullen stated that Percocet "takes the edge off minimally." (R. at 479.) Nash noted that Fullen appeared to be in apparent discomfort. (R. at 479.) She stated that Fullen's lumbar area was minimally tender to palpation, but that his lower extremities has normal touch sensation. (R. at 479.) She noted that Fullen was awaiting a neurosurgical consult/referral through workers' compensation. (R. at 479.) Nash noted that Fullen should remain out of work until he received his neurosurgical consultation. (R. at 479.)

Fullen continued to treat with Nash while awaiting a neurosurgical consultation. (R. at 477-78.) On August 19, 2010, Fullen reported that the only

relief he received was from taking Percocet. (R. at 478.) He stated that, in the past six weeks, he had slept in his bed only six times because he was unable to lie flat. (R. at 478.) Fullen's Percocet dose was increased. (R. at 478.) On September 2, 2010, Fullen complained that the increased dosage of Percocet did not help his pain, but just "messe[d] with" his mind. (R. at 477.) He said that the only relief he got was from lying on his sofa. (R. at 477.) He complained of pain into his left leg, but he denied any numbness or tingling. (R at 477.) Nash noted that the strength in Fullen's lower extremities was normal. (R. at 477.)

Fullen was seen by Steven McLaughlin, PA-C, at East Tennessee Brain & Spine Center on September 16, 2010. (R. at 532-34.) Fullen gave a history of stepping off of a 2½-foot high platform, lost his balance and landed on his back on a concrete floor at work on July 10, 2010. (R. at 532.) Fullen said that he immediately had severe back pain and that his legs collapsed beneath him when he tried to get up. (R. at 532.) Fullen said that he had suffered from back pain radiating into his left buttock, down his hamstring and calf into his left heel since the accident. (R. at 532.) He described the pain as an electric, burning sensation that was worsened with standing, sitting or walking; he also said it interfered with his sleep. (R. at 532.) Fullen said that he had constant back pain, but no bowel or bladder problems or any weakness. (R. at 532.)

McLaughlin said that Fullen appeared in no acute distress or discomfort. (R. at 533.) He noted that Fullen sat in a chair leaning to his right side with his weight off his left leg. (R. at 533.) McLaughlin noted some tenderness to palpation over the lower lumbosacral region, with Fullen's back flexion limited to about 45 degrees and somewhat more painful than extension. (R. at 533.) He noted that Fullen's lateral bending was within normal limits, and his gait was slow and

guarded, but not antalgic. (R. at 533.) He noted that Fullen's lower extremity strength was normal bilaterally. (R. at 533.) Sensory exam and reflexes were unremarkable. (R. at 533.) He noted that Fullen's straight leg raise was mildly positive on the left at about 60 degrees with dorsiflexion stretch. (R. at 533.) McLaughlin recommended that Fullen remain off work, (R. at 561), and he ordered an epidural steroidal injection to relieve his pain. (R. at 534.) Fullen received this injection on October 13, 2010. (R. at 530, 552-53.)

Fullen returned to the practice on October 20, 2010, and was seen by James Casey, PA-C. (R. at 527-29.) Fullen reported that his recent epidural injection had made his back pain worse, with back pain going into both hips. (R. at 527.) Fullen complained of low back pain radiating through his left buttock, posterior thigh, posterior lower leg and into his feet, running along the bottom of his foot on the medial side to his two toes next to his great toe. (R. at 527.) He said that the pain in his foot was more of a tingling and burning sensation, which had worsened and had been present constantly for the past week. (R. at 527.) He said that his pain worsened with any type of movement. (R. at 527.) He denied any change in bowel or bladder habits or loss of function of his extremities. (R. at 527.) Fullen said that, if he tried to walk downhill, his left leg would shake as if it was going to give out on him. (R. at 527.) Fullen stated that he had injured his back in a motor vehicle accident in 1985, but he had not had any problems until his fall at work in July 2010. (R. at 527.) Casey issued a form, stating that it was to be determined when Fullen could return to work. (R. at 559.)

Casey noted that Fullen limped when he walked. (R at 528.) Straight leg tests were slightly positive on the left, with very tight hamstrings bilaterally. (R. at 528.) Light touch sensation was intact in Fullen's lower extremities with normal

muscle strength. (R. at 528.) Reflexes were somewhat decreased. (R. at 528.) Fullen's lumbosacral spine was tender to palpation. (R. at 528.) Casey recommended that Fullen return to see Dr. Wiles to discuss surgical options. (R. at 529.)

Fullen returned and saw Dr. Wiles on November 15, 2010. (R. at 525-26.) On this occasion, Fullen complained of numbness in the bottom of his foot since undergoing the epidural injection. (R. at 525.) Fullen said that he was in constant pain in his back, bilateral buttocks and left leg into the heel of his foot. (R. at 525.) Physician's assistant McLaughlin noted: "Clinically this patient clearly has what appears to be a left S1 radiculopathy and severe mechanical low back pain." (R. at 526.) Dr. Wiles recommended an anterior lumbar fusion at the L5-S1 level. (R. at 526.) Fullen returned to the office for routine follow up on December 9, 2010, and stated that his surgery was scheduled for December 17, 2010. (R. at 522-24.)

Fullen was seen prior to his surgery for a physical therapy evaluation on December 15, 2010. (R. at 519-21.) Fullen's bilateral lower extremity and lumbar ranges of motion were within normal limits, but Fullen complained of pain with lumbar flexion and sitting. (R. at 520.) Fullen was instructed in post-operative exercises and proper body mechanics. (R. at 520.)

On December 17, 2010, Fullen underwent an anterior L5-S1 interbody fusion at Johnson City Medical Center by Dr. David A Wiles, M.D. (R. at 412-13, 538, 540, 542-43.) The Discharge Summary Report, dated December 20, 2010, stated that Fullen had been treated conservatively for a collapse of his L5-S1 disc with no foraminal stenosis with continuing back and leg pain. (R. at 412, 538.)

After surgery, motor strength in Fullen's lower extremities was normal. (R. at 412, 538.)

Fullen was seen by physician's assistant Casey on December 29, 2010, for a post-operative visit. (R at 516-18.) Fullen reported very little relief from his symptoms since surgery, and, in fact, he complained of worsened pain in his back and hips. (R. at 516.) Fullen said that the pain was worse if he tried to lie down. (R. at 516.) Casey noted that Fullen was using a cane and that his gait was slow and cautious. (R. at 517.) Fullen's incisions were clean, dry and healing properly. (R. at 517.) His surgical staples were removed. (R. at 517.) Examination showed negative straight leg testing, with normal sensation and strength in his lower extremities, but decreased reflexes. (R. at 517.) Examination of his lumbosacral spine showed tenderness to palpation bilaterally at the sacroiliac joints, with no paraspinous muscle spasm and normal sensation. (R. at 517.) Fullen was given a prescription for Valium, and he was told to remain off work. (R. at 517, 557.)

On January 11, 2011, Fullen returned to see Casey, stating that his pain really had not changed since surgery. (R. at 513.) Fullen complained of low back pain, abdominal pain from surgery and bilateral hip pain, with continuing symptoms going down his left leg. (R. at 513.) He said the pain was worse when he was up and moving around. (R. at 513.) Fullen stated that he was taking MSContin, Percocet and Valium for pain. (R. at 513.) Staight leg raise testing was normal, with normal sensation and strength in Fullen's lower extremities with some decreased reflexes. (R. at 514.) His lumbosacral spine was tender to palpation, with no paraspinous muscle spasm and normal sensation. (R. at 514.) Casey recommended that Fullen start some very gentle stretching exercises to try to loosen up his hamstring. (R. at 515.) Casey also prescribed Zanaflex to use as

needed for muscle spasms. (R. at 515.) Casey stated that Fullen was "unable to work." (R. at 515.)

Fullen saw Casey again on February 1, 2011, continuing to complain of significant pain. (R. at 510-12.) Fullen stated that his low back pain and anterior abdominal pain had decreased, but he continued to have pain down the posterior aspect of his left leg to the bottom of his foot with burning in the bottom of his foot that was particularly bothersome. (R. at 510.) He complained of starting to have similar symptoms in his right leg, and he said that pain in his feet prevented him from walking. (R. at 510.) He said that he had become very depressed with periods of anger, and he reported that he had left his family and moved in with his sister, who accompanied him to the appointment. (R. at 510.) Casey noted that Fullen was limping and using a cane. (R. at 511.) Fullen's examination remained unchanged. (R. at 511.) Casey stated that he wanted to begin to wean Fullen off MSContin, and he prescribed Neurontin. (R. at 512.) He urged Fullen to see his primary care physician about his psychological issues, but he gave Fullen another prescription for Valium. (R. at 511.) An EMG/NCV study was ordered. (R. at 512.) On February 3, 2011, Dr. Wiles issued a Return To Work Order that stated that Fullen was unable to work until follow up. (R. at 555.)

Dr. Ihab Y. Labatia, M.D., performed the EMG/NCV study on Fullen's lower extremities on March 17, 2011. (R. at 504-05, 548.) Fullen saw Celena G. Whitehead, LPN, on April 11, 2011, to go over his tests results, which showed evidence of chronic left S1 radiculopathy, with no evidence of denervation or peripheral neuropathy. (R. at 501-03, 548.) Wesley Perry, PA-C, increased Fullen's Neurontin dosage and ordered rehabilitation, including strengthening and stabilization of the lumbar spine. (R. at 503, 554.) Perry stated that, after physical

therapy, it would be determined if Fullen could be returned to work without restrictions. (R. at 503.)

Fullen was seen by Dr. Wayne Reynolds, M.D., on March 2, 2011. (R. at 475-76.) Fullen reported that he had undergone back surgery by Dr. Wiles recently, but he stated that he was not coping well with his then-current situation. (R. at 476.) Fullen reported that he had moved out of his home and was living with his sister due to being unable to get along with his son and being short-tempered with his wife. (R. at 476.) Fullen's wife, who accompanied him on this office visit, stated that Fullen had "some history of difficulty with anger," and Dr. Reynolds noted that Fullen appeared to be "somewhat angry" at his status. (R. at 476.) Dr. Reynolds noted that Fullen denied any suicidal ideation, and he prescribed Valium to be taken for muscle spasms. (R. at 476.) Fullen's wife stated that he had been taking MSContin for pain, but that this changed Fullen's personality. (R. at 476.) Dr. Reynolds noted that Fullen had been out of work since the date of his injury. (R. at 476.) Dr. Reynolds noted that he thought that Fullen suffered from post-traumatic stress disorder based on his difficulty coping with his work injury and subsequent surgery. (R. at 475.) He also noted that depression could not be ruled out. (R. at 475.) He prescribed Celexa and trazodone, and he recommended psychological counseling. (R. at 475.) He referred Fullen to Psychology Services and scheduled an appointment for March 11, 2011. (R. at 475.)

Fullen completed intake with Abingdon Psychological Services, P.C., on March 11, 2011. (R. at 574-78.) Fullen complained that he suffered from post-traumatic stress disorder based on his work-related injury and marital problems. (R. at 574.) Fullen said that he had lost his job, friends, house and lifestyle as a result of his injury. (R. at 576.) Fullen said that he slept only two to four hours a

night and had lost 30 pounds due to a poor appetite. (R. at 577.) He complained of depressed mood, decreased energy level, irritability, feeling worthless, suicidal thoughts/attempts (denied current), feeling hopeless about the future, tearfulness, low self-esteem, decreased pleasure in life, decreased sexual desire, too much guilt, withdrawing from people, difficulty making decisions, family/relationship problems, being anxious/nervous, worrying, difficulty concentrating, panic attacks, restlessness, sleep difficulties, excessive worry, eating disorder, flashbacks, temper control problems, dramatic and uncontrollable shifts in mood (from being extremely "up" or "down") and difficulty getting along with people. (R. at 578.)

Fullen saw Daniel A. Hardwick, Psy.D., a licensed clinical psychologist with Abingdon Psychological Services on March 21, 2011. (R. at 584.) Hardwick noted that Fullen was casually groomed, his affect was labile, his mood was euthymic, his activity level was normal, he had normal speech and thought processes, and he was oriented to person, place and time, with fair judgment. (R. at 584.) Hardwick noted that he performed couples counseling, encouraging them "to avoid actions which make matters worse before we can make progress." (R. at 584.) He noted that Fullen and his spouse denied any intent to hurt each other or themselves at time of session. (R. at 584.) Hardwick diagnosed Fullen with depressive disorder, not otherwise specified. (R. at 584.)

Fullen was admitted overnight at Smyth County Community Hospital on March 27, 2011, for a suicide attempt by taking an overdose of Valium. (R. at 434-35, 448, 455-57, 462.) Fullen was brought to the emergency department by police because he had refused to come with emergency personnel. (R. at 434.) Fullen claimed that he had taken 45 Valium, but his sister reported that he had taken two or three. (R. at 434.) Fullen was given Narcan to counteract the effects of the

Valium. (R. at 434, 451.) Fullen never required intubation. (R. at 435.) Fullen was discharged on March 28, 2011, to St. Alban's psychiatric unit of New River Valley Medical Center. (R. at 435, 468-72.)

Fullen was brought to St. Alban's pursuant to a temporary detention order. (R. at 468.) Fullen gave a history of work-related injury to his back in July 2010 with back surgery on December 17, 2010. (R. at 468-69.) Fullen stated that he and his wife had recently separated. (R. at 469.) Upon admission, Dr. Sarah Williams, M.D., noted that Fullen was well-groomed with slow, emphatic, deliberate, clear speech with good eye contact. (R. at 469.) Dr. Williams said that Fullen denied any thoughts of self-harm or harm toward others at that time. (R. at 469.) She noted no delusions or hallucinations and that Fullen was alert and oriented to person, place and time. (R. at 469.) She stated that his memory and cognition appeared grossly intact with poor judgment and insight. (R. at 469.) Dr. Williams diagnosed depressive disorder, not otherwise specified, versus adjustment disorder with depressed mood; consider major depression, single episode, moderate to severe, status-post overdose attempt with Valium; marital discord; consider substance abuse; and personality disorder, not otherwise specified. (R. at 469-70.) She placed Fullen's then-current Global Assessment of Functioning, ("GAF"),[5] score at 45.[6]

Notes from Fullen's inpatient stay reflect that he was at first resistant to and denied the need for inpatient treatment. (R. at 470.) After a couple of days, Fullen

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

became an active participant in his treatment plan. (R. at 471.) He was discharged on April 1, 2011, with a diagnosis of major depression, single episode, moderate to severe, without psychotic features and a personality disorder, not otherwise specified. (R. at 471.) At discharge, his GAF was 60.[7] (R. at 471.) Fullen was scheduled to see Daniel Hardwick with Abingdon Psychological Services on April 6, 2011. (R. at 472.) He was instructed to continue his preadmission medications including, Celexa, Neurontin, Percocet and Desyrel. (R. at 472.)

Fullen returned to see Hardwick on April 4, 2011, for individual therapy. (R. at 583.) Fullen reported that he had attempted suicide on March 27, 2011, overdosing on Xanax and that he was hospitalized for a week. (R. at 583.) Fullen attributed his suicide attempt to his ongoing problems with his estranged wife. (R. at 583.) Fullen said that his medication were in the control of his sister and that all weapons had been removed from the home. (R. at 583.) Fullen denied any then-current suicidal ideations or intent and any intent to harm others. (R. at 583.) Hardwick noted that Fullen's affect was labile, his mood was euthymic, his activity level, speech and thought process were normal, and his judgment/insight was fair. (R. at 583.)

Fullen returned to see Dr. Reynolds on April 6, 2011, and reported that he had attempted suicide by an overdose of Valium on March 27, 2011, because he was upset over marital discord. (R. at 475.) Dr. Reynolds noted that Fullen denied any then-current suicidal ideations or plans. (R. at 475.) Fullen stated that he was seeing Hardwick on a weekly basis for his mental health treatment. (R. at 475.)

---

[7] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Fullen questioned whether he might suffer from low testosterone, but a subsequent blood test showed his testosterone level was normal. (R. at 483.)

Fullen saw Hardwick for individual therapy again on April 13, 2011, reporting an improvement in his mood. (R. at 582.) Fullen said that he was scheduled to begin physical therapy soon. (R. at 582.) Hardwick noted that Fullen's affect was labile, his mood was euthymic, his activity level, speech and thought process were normal, and his judgment/insight was fair. (R. at 582.) Fullen denied any suicidal or homicidal ideations. (R. at 582.)

Fullen was evaluated by Candace R. Moore, PT, at Cornerstone Therapy & Balance Center on April 15, 2011. (R. at 568.) Fullen received heat/electrical stimulation to his bilateral lumbar paraspinal muscles and was instructed in abdominal and gluteal exercises and alternating hip/knee flexion. (R. at 568.) When Fullen returned on April 18, 2011, he complained of increased burning in his feet following his initial visit. (R. at 569.) On April 20, 2011, he reported that his back pain was about the same, but his burning symptoms had slightly decreased. (R. at 570.) He received physical therapy again on April 22 and 25, 2011. (R. at 571-72.)

On April 21, 2011, Fullen reported improved mood, increased appetite and a positive outlook to Hardwick. (R. at 581.) Fullen said that he had been communicating with his wife and was awaiting her decision on whether to reconcile or divorce. (R. at 581.) Hardwick noted that Fullen's affect was labile, his mood euthymic, his activity level, speech and thought process were normal, and his judgment/insight was fair. (R. at 581.)

Fullen continued to report improvement in his mood, affect and appetite to Hardwick on May 5, 2011. (R. at 579-80.) Fullen said that he was reconciled with the fact that he and his wife would likely divorce, but he was concerned about his son's anger toward his mother. (R. at 580.) Hardwick noted that Fullen was well-groomed with a cooperative attitude, normal motor activity and speech, euthymic mood, appropriate affect and no suicidal or homicidal ideations. (R. at 579.) He also noted that Fullen's thought processes, memory, judgment and insight were intact. (R. at 579.) Hardwick assessed Fullen's GAF score at 50. (R. at 579.)

While Fullen complained of continuing pain, Hardwick reported improvement in his mental health on May 15, June 9 and June 23, 2011. (R. at 658-60.) On May 15, 2011, Hardwick assessed Fullen's GAF score at 55. (R. at 660.) On June 9, 2011, Hardwick said that he would consider terminating his therapy on Fullen's next session. (R. at 659.) On June 23, 2011, Hardwick terminated therapy with the understanding that Fullen could return if necessary. (R. at 658.)

Fullen saw Dr. Reynolds again on June 7, 2011. (R. at 587.) Fullen reported that he had started doing better after he and his wife made the decision to divorce. (R. 587.) He reported that he continued to treat with Hardwick for his mental health issues and that he was scheduled to see Dr. Wiles in follow up to his back surgery on June 14, 2011. (R. at 587.) He said that he was being considered for an implantable electronic stimulator. (R. at 587.)

Fullen saw physician's assistant McLaughlin in Dr. Wiles's office on June 14, 2011. (R. at 607-08.) McLaughlin noted that Fullen's previous EMG study showed evidence of a chronic left S1 radiculopathy, with no peripheral neuropathy.

(R. at 607.) Fullen complained of continuing back pain, but he stated that Neurontin had helped some. (R. at 607.) He stated that he thought physical therapy had aggravated his leg pain. (R. at 607.) McLaughlin noted that Fullen's range of motion in his lumbar spine was limited, but that his gait was nonantalgic. (R. at 608.) He said that straight leg raise was negative. (R. at 608.) McLaughlin noted that Fullen had decreased sensation in an S1 pattern, but no allodynia. (R. at 608.) X-rays of Fullen's lumbar spine showed what McLaughlin called "the beginnings of a good fusion." (R. at 608.) A functional capacity evaluation was ordered in an effort to make return to work recommendations and restrictions. (R. at 608.) McLaughlin stated that Fullen was "not able to work." (R. at 608.)

Fullen saw Dr. Wiles on July 11, 2011, to review the results of his functional capacity evaluation. (R. at 604-06.) Fullen complained of continuing back pain and bilateral leg pain, greater on the left than on the right. (R. at 604.) Dr. Wiles noted that Fullen was seven months from his surgery and at maximum medical improvement. (R. at 604.) Physician's assistant Perry noted calf pain, decreased range of motion, low and middle back pain and joint pain. (R. at 605.) He also noted numbness and tingling sensation with trouble walking. (R. at 605.) Dr. Wiles noted poor range of motion in Fullen's lumbar spine with a nonantalgic gait. (R. at 605.) Straight leg raise was negative with a decreased sensation in an S1 pattern with no allodynia. (R. at 605.) Based on Fullen's functional capacity evaluation, Dr. Wiles limited Fullen to medium[8] work with a permanent restriction against lifting any more than 30 pounds. (R. at 605.) Dr. Wiles also stated that Fullen could not perform repetitive bending and twisting or prolonged sitting or standing.

---

[8] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2016).

(R. at 605.) Based on Fullen's history of suicide attempt by overdose, he recommended against prescribing any opiates for Fullen's complaints of chronic pain. (R. at 606.)

State agency psychologist Stephanie Fearer, Ph.D., completed a Psychiatric Review Technique form, (PRTF), regarding Fullen's alleged mental impairments on July 27, 2011. (R. at 86-87.) According to Fearer, Fullen suffered from an affective disorder and anxiety-related disorder that did not meet the requirements for a listed impairment. (R. at 86.) She opined that Fullen suffered no restrictions on activities of daily living, mild difficulties in maintaining social functioning, no difficulties maintaining concentration, persistence or pace and one or two repeated episodes of decompensation. (R. at 86.)

On August 17, 2011, Fullen returned to Hardwick for individual counseling to address increasing symptoms of depression due to chronic pain. (R. at 657.) Hardwick noted that Fullen's mental status evaluation remained unchanged, and he assessed his GAF score at 55. (R. at 657.) On August 18, 2011, Hardwick completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), on which he stated that Fullen's ability to understand, remember and carry out instructions and to respond appropriately to supervisors, co-workers and work pressures in a work setting were not affected by his mental impairment. (R. at 667-68.)

Fullen was seen by Dr. Marc A. Valley, M.D., on August 18, 2011, for evaluation for placement of an implantable electronic stimulator. (R. at 602-03.) Dr. Valley stated that Fullen suffered from failed spinal surgery syndrome with both extremity and axial pain and a defined chronic S1 radiculopathy. (R. at 603.)

Fullen returned to Hardwick on August 24 and 31, 2011, and Hardwick noted no change in his mental status evaluation or GAF score. (R. at 655-56.) Hardwick performed a psychological evaluation of Fullen on August 27, 2011, regarding the implantation of an electronic stimulator to address his chronic back pain. (R. at 648-52.) Fullen reported that he had suffered from chronic pain, which significantly affected his quality of life and activities, since he injured his back in a fall at work in July 2010. (R. at 649.) Fullen reported that he slept only four to five hours a night due to physical pain and emotional concerns. (R. at 649.) He reported feelings of depression, hopelessness, tearfulness, low self-esteem, anhedonia, withdrawn behavior, anxiety, flashbacks, irritability, mood swings, problems with concentration, insomnia and appetite concerns. (R at 649.)

Hardwick noted that Fullen arrived promptly for his evaluation, was pleasant, cooperative, normally groomed and casually attired. (R. at 650.) His speech was clear and coherent; his thought processes appeared goal-directed; he appeared to understand instructions, approached the tasks in a positive manner and was able to sustain effort throughout evaluations. (R. at 650.) Hardwick administered the Wechsler Abbreviated Scale of Intelligence, ("WASI"), test, which indicated a valid full-scale IQ score of 104, or average intelligence. (R. at 650.) Results of the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), appeared valid and indicated symptoms of emotional distress and depression. (R. at 651.) Hardwick recommended that Fullen continue to participate in counseling and medication treatment for his depression. (R. at 651.)

On August 31, 2011, Hardwick suggested that Fullen discuss a recent medication change, which appeared to correspond to his mood change, with his treating physician. (R. at 655.) Fullen reported some improvement in his mood on

September 7, 2011, with some good days with less pain. (R. at 688.) Fullen continued to treat with Hardwick, who noted that he continued to make progress, through November 30, 2011. (R. at 683-86.)

On October 5, 2011, Dr. Bert Spetzler, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment. (R. at 99-100.) According to Dr. Spetzler, Fullen could lift up to 20 pounds occasionally and 10 pounds frequently, stand and walk about six hours and sit about six hours in an eight-hour workday with no postural, manipulative, visual, communicative or environmental limitations. (R. at 100.)

State agency psychologist Joseph Leizer, Ph.D., completed at PRTF on Fullen on October 6, 2011. (R. at 98-99.) According to Leizer, Fullen suffered from an affective disorder and anxiety-related disorder that did not meet the requirements for a listed impairment. (R. at 98.) He opined that Fullen suffered no restrictions on activities of daily living, mild difficulties in maintaining social functioning, no difficulties maintaining concentration, persistence or pace and one or two repeated episodes of decompensation. (R. at 98.)

By Order of the Virginia Workers' Compensation Commission, dated December 8, 2011, Fullen settled his workers' compensation claim against Utility Trailer Manufacturing Company. (R. at 361-66.) As part of its approval of this settlement, the Commission, based on the representations of the parties, found that Fullen had reached maximum medical improvement of his work-related injury to his low back and had been released to return to modified duty work, which his employer had offered. (R. at 361-62.)

Robert C. Miller, Ed.D, a licensed clinical psychologist, performed a consultative psychological evaluation on Fullen on March 7, 2012. (R. at 671-75.) Fullen reported his work-related back injury and subsequent spinal fusion surgery. (R. at 671.) Fullen reported chronic pain in his back, hips and foot. (R. at 671.) He also reported nerve damage in his legs and feet. (R. at 671.) Fullen reported a suicide attempt in 2011 due to his no longer being able to cope with his physical pain and emotional distress from marital problems. (R at 671.) Fullen stated that he was not taking any medication because he was changing to a new primary care physician. (R. at 672.) Fullen said that his appetite had improved, and he had put on weight. (R. at 672.) Fullen complained, "I don't have any get up and go." (R. at 672.)

Fullen recited a lengthy work history with no employment problems until his recent accident. (R. at 672.) He said that he graduated from high school with Bs and Cs. (R. at 672.) Fullen said that he routinely did laundry and washed dishes. (R. at 672.) He said that he needed no assistance with bathing or dressing himself. (R. at 672.) Miller noted no visible or reported physical deformities, rigid gait and motor coordination and erect, stiff posture. (R. at 673.) He noted that Fullen stood to stretch often during the evaluation. (R. at 673.)

Miller noted that Fullen presented as depressed and worried, his speech was pressured and slow, his eye contact, expressive language, receptive language, judgment and insight and immediate, recent and remote memory were normal. (R. at 673.) Miller stated that Fullen was oriented to time, place, person and situation, and his responses were coherent and easy to understand. (R. at 673.) He said that Fullen's attention was within normal limits, but that he fatigued due to pain and could not be expected to concentrate for extended time periods. (R. at 673.) Miller

said that Fullen tended to focus on past losses and hardships, which contributed to his depressed mood. (R. at 673.) Fullen reported that his mood on most days was sad and despondent. (R. at 673.) He said Fullen's thinking was clear and devoid of confusion and disorientation with no hallucinations of any kind present. (R. at 673.) Miller said that Fullen's intelligence appeared to be consistent with his prior IQ testing results in the average range of functioning. (R. at 673.) Miller administered the MMPI-2 and stated that it indicated that Fullen was depressed, anxious and preoccupied with somatic problems. (R. at 674.) Miller said that Fullen was fatigued with extremely low energy, resulting in loss of interest and ability to actively engage in social and occupational endeavors; he was socially withdrawn with a pessimistic attitude about his circumstances and life in general. (R. at 674.)

Miller noted that he did not believe that Fullen was at any risk of self-harm or harm of others. (R. at 674.) He stated that Fullen would benefit from counseling to address his grief and depression and medication for his depression. (R. at 674.) Miller diagnosed Fullen with major depressive disorder, recurrent, moderate to severe and a generalized anxiety disorder. (R. at 675.) He assessed Fullen's GAF score at 55. (R. at 675.)

Fullen returned to see Hardwick on April 25, 2012. (R. at 682.) Hardwick noted no significant change in his condition. (R. at 682.) He continued to see Hardwick through October 18, 2012. (R. at 678-81, 730-31.) On October 1, 2012, Fullen reported a significant increase in his level of depression. (R. at 731.) He stated that he had been withdrawing from friends and family and coping with his father's illness. (R. at 731.) On November 20, 2012, Hardwick noted that Fullen's

affect and mood were markedly improved. (R. at 745.) Fullen reported that he had increased his social contacts. (R. at 745.)

Fullen treated with Lebanon Community Medical Care from March 12, 2012, to June 5, 2014. (R. at 701-22, 734-41, 748-82, 799-831.) On Fullen's first appointment with Dr. Samina Yousuf, M.D., he complained of heartburn and low back pain, weakness and left leg weakness. (R. at 720.) He also complained of fatigue, depression, difficulty concentrating and insomnia. (R. at 720.) Dr. Yousuf noted that Fullen appeared to be in pain with decreased range of motion in his back and hips. (R. at 721.) Fullen reported that he was taking Nexium, Celexa, Neurontin, Percocet and Trazodone. (R. at 721.) Dr. Yousuf diagnosed Fullen with low back pain, heartburn, muscle weakness, insomnia and depression with anxiety. (R. at 721.) She ordered refills of Celexa and Neurontin and prescribed Restoril (temazepam) for insomnia and Vicoprofen (hydrocodone/ibuprofen) for pain. (R. at 721.)

On April 12, 2012, Fullen saw Dr. Johan U. Hernandez, M.D., with Lebanon Community Medical Care. (R. at 717-19.) Fullen complained that the Vicoprofen was not helping his pain very much, but that Restoril was helping with his insomnia. (R. at 717.) Dr. Hernandez noted that Fullen did not appear to be in any apparent distress. (R. at 718.) Dr. Hernandez noted bilateral positive straight leg raises with left lower extremity weakness. (R. at 719.) Dr. Hernandez increased Fullen's Neurontin dosage. (R. at 719.)

Fullen saw Dr. Yousuf again on May 10, 2012. (R. at 713-16.) On this occasion, Dr. Yousuf's notes stated that Fullen had a history of a lumpectomy on his left breast, which, although possible for a man, is not mentioned anywhere else

in Fullen's medical history. (R. at 713.) Dr. Yousuf noted bilateral positive straight leg raises with left lower extremity weakness. (R. at 715.) She refilled Fullen's prescriptions, except that she substituted Percocet (oxycodone/acetaminophen) for Vicoprofen. (R. at 715.) On June 11, 2012, Fullen told Dr. Yousuf that he was sleeping much better with Restoril. (R. at 710.) On this occasion, Fullen stated that his pain was a 2 out of 10 with his medication and a 7-8 without his medication. (R. at 710.) Fullen's examination was essentially unchanged, and Dr. Yousuf recommended he start home back strengthening exercises and try to lose weight. (R. at 712.)

On July 10, 2012, Fullen told Dr. Yousuf that he had not started taking the Celexa she had prescribed, but had been taking Aleve for hip pain without relief. (R. at 707.) Fullen stated that he felt a mild degree of depression. (R. at 707.) On this occasion, Fullen said that his pain was a 4 out of 10 with his medication. (R. at 707.) He said that his hip pain worsened if he sat for a long period of time. (R. at 707.) Dr. Yousuf added a prescription for Mobic. (R. at 709.) She recommended that Fullen increase his physical activity. (R. at 709.) On August 9, 2012, Fullen reported that his pain had decreased to a 3 out of 10 since taking Mobic. (R. at 704.) On September 6, 2012, Fullen reported that Mobic was "helping him a lot." (R. at 701.)

On October 2, 2012, Fullen reported that his pain was improved on Mobic, but that it was causing stomach problems. (R. at 738.) She also wrote Fullen a prescription for Cymbalta for his depression. (R. at 740.) Dr. Yousuf completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) on October 2, 2012. (R. at 724-26.) Dr. Yousuf stated that Fullen could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items

weighing less than 10 pounds. (R. at 724.) She stated that Fullen could stand and/or walk less than two hours and sit less than six hours in an eight-hour workday. (R. at 724-25.) She stated that Fullen's ability to push and pull was limited in his upper and lower extremities due to lumbar disc disease with desiccation at different levels and left lower extremity weakness. (R. at 725.) Dr. Yousuf stated that Fullen could never balance, kneel, crouch, crawl or stoop and could occasionally climb ramps, stairs, ladders, ropes or scaffolds. (R. at 725.) She stated that Fullen should avoid exposure to vibration and hazards, such as machinery and heights. (R. at 726.)

On November 5, 2012, Fullen stated that he was taking Cymbalta and that his depression had improved. (R. at 734.) On February 7, 2013, Fullen stated that he was out of Cymbalta and could not afford it. (R. at 748.) On March 7, 2013, Fullen stated that he was doing much better with his current medications. (R. at 779.) Dr. Yousuf continued to recommend home back strengthening exercises and weight loss. (R at 781.) On June 10, 2013, Fullen reported that he was sleeping much better on Restoril. (R. at 768.) On August 12, 2013, Fullen reported a fall while on vacation and his concern that he might have broken a rib. (R. at 761.)

On November 14, 2013, Fullen complained to Dr. Yousuf of increasing burning left leg pain and weakness and constant heartburn. (R. at 828-31.) Dr. Yousuf renewed Fullen's prescriptions and recommended another MRI of his lumbar spine. (R. at 831.) When Fullen returned to see Dr. Yousuf on December 12, 2013, he complained of worsening left leg weakness, low back pain and swelling and pain in his right elbow. (R. at 824.) Dr. Yousuf ordered a lumbar spine x-ray. (R. at 827.)

A MRI was performed on Fullen's lumbar spine, with and without contrast, on December 23, 2013. (R. at 788.) The images showed the evidence of Fullen's prior lumbar fusion surgery and his old L2 compression fracture, but no evidence of any disc herniation, bulge or central canal stenosis. (R. at 788.) Lumbar x-rays taken the same date also showed no abnormality other than the surgical hardware and the old compression fracture. (R. at 786.)

When Fullen returned to see Dr. Yousuf on January 13, 2014, he complained of a 15-pound weight gain with fatigue and increased burning in his feet and pain. (R. at 820.) This medical report reflects that Fullen was taking Valium in addition to Neurontin and Percocet. (R. at 822.) Although Dr. Yousuf's report said that Fullen suffered from depression, which was improved on medication, the report does not list that he was taking any antidepressant medication. (R. at 820-23.) Dr. Yousuf recommended that Fullen increase his physical activity and lose weight. (R. at 823.) On February 11, 2014, Fullen complained that he had bent down to pick up something and had severe pain in his left lower back with spasm of severe intensity. (R. at 815.) Dr. Yousuf gave Fullen a trigger point injection for muscle spasms. (R. at 818.) On March 10, 2014, Fullen complained of insomnia and anxiety. (R. at 810.) On April 9, 2014, Fullen's blood sugar level was 158, and Dr. Yousuf placed him on a 2000-calorie a day diabetic diet. (R. at 806, 809.) On May 8, 2014, Fullen complained of mild depression. (R. at 802.) Dr. Yousuf's note stated that his medications included an antidepressant, but none was listed in the review of his medications. (R. at 802, 803-04.) Dr. Yousuf's June 5, 2014, note reflected the same conflict. (R. at 799, 800-01.)

Dr. Yousuf completed another Medical Source Statement Of Ability To Do Work-Related Activities (Physical) on June 26, 2014. (R. at 794-97.) Dr. Yousuf

stated that Fullen could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing less than 10 pounds. (R. at 794.) She stated that Fullen could stand and/or walk less than two hours and sit less than six hours in an eight-hour workday. (R. at 794-95.) She stated that Fullen's ability to push and pull was limited. (R. at 795.) Dr. Yousuf stated that Fullen could never balance, kneel, crouch, crawl or stoop and could occasionally climb ramps, stairs, ladders, ropes or scaffolds. (R. at 795.) She stated that Fullen should avoid exposure to vibration and hazards, such as machinery and heights. (R. at 797.) Dr. Yousuf also stated that Fullen had bilateral burning in his feet that required him to prop his feet up most of the time. (R. at 796.)

On August 4, 2014, Fullen reported suffering from daily panic attacks. (R. at 841.) Dr. Yousuf's report does not note any psychological or psychiatric referral. (R. at 841.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Fullen argues that substantial evidence does not exist to support the ALJ's finding that he was not disabled. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-9.) In particular, Fullen argues that substantial evidence does not support the ALJ's finding as to his residual functional capacity, in that the ALJ did not comply with the "treating physician's rule," and he gave inappropriate weight to the state agency medical and psychological consultants' opinions. (Plaintiff's Brief at 5-6.) Fullen also argues

that the ALJ did not properly consider his subjective complaints of pain. (Plaintiff's Brief at 6.) According to Fullen, he suffered from constant burning in his feet and hip pain, had to alternate between standing and sitting and had to elevate his feet several times a day for relief.

In his determination of Fullen's residual functional capacity, the ALJ first considered Fullen's subjective complaints, including pain. (R. at 28-30.) While the ALJ found that Fullen's medically determinable impairments, namely degenerative disc disease of the lumbar spine, status-post spinal fusion with lower extremity radiculopathy, could reasonably be expected to cause the alleged symptoms, he found that Fullen's allegation that he had to elevate his feet several times a day to not be credible. In particular, the ALJ noted that no physician had instructed Fullen to, nor had Fullen reported to any physician that he needed to, elevate his legs 15 to 20 times a day to relieve pain and numbness in his feet. (R. at 32.) The ALJ further noted that diagnostic testing had confirmed chronic left S1 radiculopathy, but no evidence of peripheral neuropathy. (R. at 33.) This evidence supports the ALJ's decision to discredit Fullen's claims that he needed to elevate his feet numerous times throughout the workday.

The ALJ also did not give controlling weight to Dr. Yousef's opinions concerning Fullen's residual functional capacity. Dr. Yousef's restrictions limited Fullen to less than a full range of sedentary work, in that she stated that Fullen could stand and walk for less than two hours and sit for less than six hours in an eight-hour workday and could not stoop. The ALJ discredited this opinion because he found it inconsistent with Fullen's reports of his daily activities and the treatment records of his treating orthopedist. (R. at 33.)

It is true that Fullen's treating orthopedist, Dr. Wiles, released him to return to work with limitations on July 11, 2011. Prior to that date, however, the uncontradicted medical evidence shows that Fullen's treatment providers all had opined that he could not work. (R. at 479-80, 482, 503, 515, 517, 555, 557, 559, 561, 608.) There is no medical opinion contained in the record stating that Fullen could return to work until Dr. Wiles released him on July 11, 2011. (R. at 605.) The state agency physician's earliest opinion was dated October 5, 2011, (R. at 99-100), and it stated that Dr. Spetzler's opinions were based on Fullen's then-current condition. (R. at 99.) The ALJ stated that he was discrediting Dr. Wiles's opinion because it did not provide a "function-by-function" analysis. (R. at 32.) Dr. Wiles, however, did provide this analysis when he returned Fullen to work on July 11, 2011. Prior to that date, Dr. Wiles had stated that Fullen, who was recovering from spinal fusion surgery, could not work. Based on this evidence, I find that substantial evidence does not exist in the record to support the ALJ's finding that Fullen was capable of a limited range of sedentary work prior to July 11, 2011.

Regarding Fullen's mental residual functional capacity, the ALJ found that he could perform low-stress work, defined as having only occasional decision making and changes in the work setting, with only occasional interaction with the public or co-workers. (R. at 28.) In reaching this conclusion, the ALJ discredited the opinions of the state agency reviewing psychologist and consultative psychologist Hardwick, insofar as they did not recognize these limitations. (R. at 33.) He also discredited any opinion that Fullen's GAF score was less than the 55-60 range, indicating moderate symptoms. (R. at 34.) While this weighing of the psychological evidence appears appropriate, the ALJ's finding regarding Fullen's mental residual functional capacity contradicts his earlier finding that Fullen suffered from moderate difficulties with concentration, persistence or pace. (R. at

27.) In that the ALJ did not explain these inconsistencies, I cannot determine that his mental residual functional capacity finding is supported by substantial evidence.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding with regard to Fullen's residual functional capacity; and

2. Substantial evidence does not exist in the record to support the Commissioner's finding that Fullen was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court vacate the Commissioner's decision denying benefits and remand Fullen's claim for DIB to the Commissioner for further development.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2016):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties at this time.

DATED:     May 17, 2017.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE